May it please the court. My name is Shandor Badruddin. I represent the appellant, John Kevin Moore. One of the issues raised in our appeal was the failure to give a specific unanimity instruction. The right to a unanimous verdict is a fundamental constitutional right, and it's very important, and it wasn't safeguarded in the court below. I thought the court gave the general unanimity instruction. Well, I guess I would say yes to that. And the defense was asking for a specific unanimity instruction. So the court always has to give a general unanimity instruction. And then I think the issue before this court is, was a specific unanimity instruction required? And a specific unanimity instruction is required when there's a chance of jury confusion based on a complexity of the evidence that fewer than 12 jurors might convict based on different theories of liability. You see that potential in cases where the government advances multiple theories of guilt, asserts multiple schemes, and in a variety of other situations. Well, it's my question. I went to compare the model instruction, your proposed instruction, and the court's final instruction, and so they didn't give the model instruction. It was tailored more along the line of the one offered by Mr. Moore, although not precisely. But I thought importantly, and this would appreciate your comment, is that in the final instructions, tracking what Mr. Moore proposed, he said that the whole jury, all of you agreeing as to the scheme or plan to defraud, and the identity of the person who is the victim. So that was a fairly specific request. And then the second part of the unanimity instruction talked about the particular false statement. So I was unclear after doing my comparison as to what the infirmity of the final instruction is. All right. Well, I would like to basically assume then this case presents a situation where a specific unanimity instruction is required, and then the question is, is the court's instruction number six, which is the court's specific unanimity instruction, adequate to cover the situation presented? That's how I interpret your question. Well, I'm not making a decision whether it's required or not. But whether it's required or not, I'm trying to figure out how the final instruction might be viewed as deficient as a specific unanimity instruction, particularly when compared to your proposed instruction, it is a slightly compressed variation on the theme. So what is it in the final instruction that is deficient? I would say the final instruction is lacking in the following respects. It uses the word, well, as you pointed out, with all of you agreeing as to the scheme. It never says the same scheme. It never says one scheme. It's not specific enough to tell the jurors, look, all 12 of you have to agree on one scheme, or you could agree on more than one scheme so as long as you all agree on the same couple of schemes. So in other words, you think the words all of you agreeing as to the scheme or plan is too vague and it should have said the same scheme or plan. Yes, and in the instruction I requested, I used that terminology. I said one such scheme. Well, you said one such, and it says here you have to agree as to the scheme or plan. So I'm not quite sure how that's ambiguous, suggesting that I can agree to one scheme and you can agree to one and he can agree to another one. What is it that's ambiguous about the instruction given? Well, if we had 12 lawyers on the jury, it might just be okay. But there were no lawyers on the jury, and I think the instruction needs to be clear that they have to agree on the same scheme or a single scheme or the same assortment of schemes. How many schemes did the government offer? I counted four. There was the Big Sky Mineral Resources Scheme. There was the Glacier Gala Art Scheme. There was the Universal Wideband Business Technologies Scheme, and that was count 10. And there was the smelter in Arizona that was going to boil the dirt down and extract the precious metals, probably gold. That was a fourth scheme, and that was count 11. So the jurors could have said, you know, I think it was the art. I think he was the whole scheme was the art. There were some photographs of his home. It had all these art pieces that were on sale for consignment. They could have thought it was the art. They could have thought it was the Big Sky Mineral Resources Oil and Gas Lease Scheme, which had absolutely nothing to do with count 10 and 11, but because of the complexity of the evidence. Did the government in the indictment, was there only one indictment or were there two indictments? There were, well, he was tried on one, but there were only, there were two. There was an original indictment, and then a year later, 13 months later, there was a superseding indictment, and that's what the trial was conducted on. Were the schemes broken out in the indictment by count? No. They were set forth in a manner and means section of the superseding indictment, paragraph 5 through 13, and then you get to the wire fraud counts in paragraph 14, and that's at the record, page 1309. Sorry, 1307. So the story is laid out and then the counts follow. I would say, you know, the story was laid out. I would say the schemes were set forth, but there was no particular identification that this scheme belongs to that count, this other scheme belongs to a separate count. You figure it out, Mr. Moore, and you figure it out, ladies and gentlemen of the jury. And the instruction number six that the court gave wasn't adequate to express the need for the jurors to focus on, well, to unanimously agree on the scheme or schemes that they were going to base their verdict on. How about an oral argument? Did the government attorneys point to, you know, here's this scheme and all of you need to agree? How was the argument? You mean the closing argument? Yes. I don't remember the argument being that specific. I think it was, I would say no, that didn't occur. I haven't read. But you could make, the defense could make that argument, right? I mean, there's nothing in the confines of this instruction that would prevent the defense from saying when it says you have to all of you agree to the scheme, it means what it says. You all have to agree on the same scheme. So nothing in here would prevent that argument. That's correct, Your Honor, except it's not the same when I say it as when the gentleman up on the bench in the black robe says it. Because the law comes from him, not from me. Right. But the argument could be a female judge too. Yes. In this case it was a male judge, and that's why I stuttered. I was trying to be, you know, non-gender specific. Thank you. But I guess I'm just having some trouble understanding why this would be reversible given the wording. So what's really missing here is the word same or single from the modified instruction. I would say yes. Okay. But I would also say the district court could have found any means to express the need that same or single would have expressed. Whatever words is going to provide clarity, and the clarity is lacking. And the problem is my client was denied his right to a unanimous verdict by virtue of this inadequate instruction. And if my instruction is not adequate or not appropriate or not the one that he should have given, well, once a specific unanimity instruction is required, it's plain error for the district court not to give an adequate instruction. So if mine's no good, the district court was compelled by the Constitution to dream up a better one, which he failed to do. There was another issue raised on appeal, the failure to transfer venue, the denial of the motion to transfer venue. I wanted to state quickly what that claim is not. It's not a claim that the Sixth Amendment was violated. It's not a claim that Article III, Section 2 of the Constitution was violated. And it's not a claim that Federal Rule of Criminal Procedure 18 was violated. It's a claim that Local Rule 18.1 was violated. And Local Rule 18.1 is substantially the same and identical in many respects to the pre-1966 version of Federal Rule of Criminal Procedure 18. And back then and right now in Montana, there is a requirement of divisional venue. And divisional venue has its roots in the Constitution, Article III, Section 2, and the Sixth Amendment. It's ‑‑ but it's ‑‑ and as a local rule, it has to be followed. It was implemented pursuant to 28 U.S.C. 2071, and the court didn't follow it. There may be a question, I think, before this court, well, where did the crime occur? I think the easiest way to look at it is to look at the trial evidence. The only thing that happened in Great Falls was lunch with the alleged victim in Count III, Condra Niswanger. He had lunch in Great Falls. There was no ‑‑ the essence of wire fraud is the use or misuse of the wires. There's no use or misuse of the wires in Great Falls. It all occurs in the counties that make up the ‑‑ But if it's based on a local rule and not the Constitution or the Federal Rule, what then is the grounds for the reversal? You would want a retrial in the other division. Yes, ma'am. And the basis for that is the local rule? Yes, ma'am. The basis is the local rule. It's the law. The court didn't follow it. Was there any prejudice? That's my question. Well, I think the prejudice is in the sense, as I mentioned, there's venue and then there's vincentage. So venue is the place of trial. It has its roots in the Declaration of Independence. The Crown used to drag colonists over to England and try them in England. Mr. Moore had a right to be tried in the Missoula Division. Similarly ‑‑ He had a constitutional right to be tried in the district where the crime occurred, which was the District of Montana. But now you're saying he has a rule-based right to be tried in the other division. So I'm trying to figure out how that's the basis for a reversal. I think ‑‑ If it's not a constitutional ‑‑ Because you keep going back to the Declaration of Independence and the Constitution, which makes it sound like it is a constitutional right. I guess it has its roots in the Constitution, but the words aren't found in the Constitution. But prior to 1966, violations of Federal Criminal Rule 18 required reversal. And that's what we have here is a pre‑1966 version of Rule 18, our local Rule 18.1, and a violation. And if you look at the cases I hope I cited in my brief that predate 1966, and the government relies on cases that post‑date that ‑‑ Well, that's because we actually are living post‑1966 now. So, I mean, it makes sense to cite those cases. Well, not really, because the rule we have in Montana, in the District of Montana, is the Federal Criminal Rule 18 as it existed prior to 1966. And there's nothing antiquated about the rule. Like I say, it had its roots in the Constitution, and it was a fine rule before 1966. And it was so fine that our district court judges adopted it in our district. So the rule has an out for the court unless the court orders a change of venue. It does. But in this case, the court did not order a change of venue. And I think what it would have done is transferred the one count, count three, which, by the way, we don't concede occurred in Great Falls. It's just he had lunch with the victim in Great Falls. He could have transferred that one count with the client's waiver or consent to the Missoula Division. Alternatively, under multi‑count indictments, you sever it. We could try it at one 20‑count case in Missoula Division and one one‑count case in the Great Falls Division. Or I think in this case the court could, for judicial convenience, economy, et cetera, transfer it, which it never did, never made a decision to transfer. So if we send it back, then the judge would make that decision and no harm, no foul, right? You could appeal the determination, I suppose. I don't think the court ‑‑ so Rule 18.1 was violated. You then send it back, and the court has the discretion to do what the court has the discretion to do, which is to transfer venue. But that's not what happened here. That's not what happened below. I understand that. All right. Do you want to save your remaining time? I do. Thank you, Your Honor. Good morning, Your Honors. Ryan Weldon appearing on behalf of the United States. May it please the court, happy Friday. I figured I would start with the unanimity instruction, given that that was the court's attention unless there were any other questions. I wanted to start with the instruction that Judge Morris issued. And you can see there in the first element, it actually provides the unanimity component of that. And it says, with all of you agreeing as to the scheme or plan to defraud devised by the defendant and the identity of the person who was the victim of the scheme or plan to defraud. So essentially what Judge Morris did is he took the instruction that Mr. Moore proposed and then incorporated that into the instructions. But I think this is actually the easiest part for the court in looking at the analysis for this case. The exhibits all tracked the counts. So if you look at the supplemental excerpts of records, exhibit one is count one. Exhibit two is count two. Exhibit three is count three, and so on and so forth. So when we were arguing the case to the jury, both in closing and throughout the case, the jury knew that every single exhibit corresponded to the count that was charged. You tried to relate the evidence to the counts. That's exactly right. So if you look at the supplemental excerpts of records, Your Honor, you can see right beginning on page one that the government provided. And this is why it was so important that we give this to you, because we wanted to make sure that there wasn't any jury confusion in terms of them just understanding the nature of the case. Right. But it also guaranteed that it would be unanimous because they're looking at the exhibits. They know that those are the actual exhibits for that count. So I don't even think that there was a specific unanimity instruction that was required just on the way that the evidence came in and was presented to the jury. But then Judge Morris actually took a different step and made sure that it was crystal clear to the jury by then adding that component for the element. So I don't think that there was any concern about confusion of the jury. And then just to explain that more and why I think it matters, I don't think there was any confusion for the defense either, because if you look at Mr. Morris' testimony, they actually walked through each count based on each wire, and that's because those were the exhibits that the government marked and provided to the jury. So I think that that's important for the court to consider, is that, first of all, there wasn't even a necessity for the jury instruction or for the unanimity instruction. But more importantly, the exhibits encompassed all of that evidence, so there wouldn't be any concern about a jury that wasn't unanimous. Unless there were any other questions, I did want to at least address the 18.1 issue for the rule. So with this one, if you look at the actual language in the rule, it provides that there is discretion with the judge, unless the judge orders otherwise. When I'm listening to the remarks from Mr. Morris' counsel, essentially it seems like there would be one case, one scheme, multiple manner and means, and it sounds like we would try those cases repeatedly throughout the District of Montana in different divisions within the District. And I don't think that anybody meant that, and I think the District Court made sure that there wasn't any prejudice to Mr. Moore. Mr. Moore was transferred specifically to Missoula so that he could work with counsel who was in Missoula. And keep in mind that this case had been pending for about a year, and it was in Great Falls. There was Great Falls counsel, and then ultimately it transferred counsel. Counsel was in Missoula. That's then when we have the motion to transfer venue. Counsel didn't address the abuse of trust enhancement. Yes, Your Honor. The abuse of trust enhancement was based on Mr. Moore's position in Big Sky Mineral Resources, and he was the managing member. So there were multiple managing members, and then there were other just members within the LLC. I think the component here that matters for the abuse of trust enhancement is discretion. So we have the position, and that position is as a managing member, but then we have how does that facilitate the crime, because if it doesn't facilitate the crime, then we don't impose the abuse of trust enhancement. Mr. Moore, however, he was the only one who had access to the financial records. Doug Drysdale, the lawyer for Big Sky Mineral Resources, he even testified, and he didn't have access to the financial records. To whom is the trust owed? The victims? I think in part, yes. You say in part because it seems to me the trust flows to the victims, and you've got to show that there's a fiduciary or a fiduciary-like relationship between the defendant and the victim. And here he has a fiduciary relationship, but it's to Big Sky. So I don't understand how the linkage is there. I think that— And the examples that we find in the guidelines would suggest that that's the case, you know, lawyer, client, accountant, client, stockbroker, client, things of that nature. But I think that him operating—I think he has really two roles, and I think that's how he portrayed it to the victims. He's working for Big Sky Mineral Resources, so he's the managing member. He has the duty to the corporation, the LLC. But then he's not presenting it purely as Big Sky Mineral Resources. This is Kevin Moore who's going to the people. He's going to be working with X, Y, and Z, General Vallalay, all of these other individuals. But the crime is not something he did to Big Sky. The crime is that he induced by fraud investors to invest in Big Sky. So I just don't see the link between the trust and where it's going and his actions here. None of the examples that are in the guidelines seem to suggest that there is a breach of trust in this case, where you have a fiduciary duty for the entity that's being used to perpetrate the fraud, but is not the victim of the fraud. But I think if I would just refer the court to the guidelines for the abuse of trust, it has the examples, which I always categorize in my mind, the teller versus the bank executive, for example. And so— But who's the victim in that case? That would be the— The embezzlement of the bank. But it's also the person who's providing the money as well. I think you can have a dual role with that. So I don't think that the guidelines separate it out that much. What they're focused on is that you have the teller who's taking the money from the person. The bank is certainly a victim. But then also the person who is losing their money, who doesn't have the benefit of the banking system, they're also a victim. It depends what the crime is, though. I mean, is it embezzlement, taking the bank's money? Then the teller does not have a fiduciary relationship. The manager may, by embezzling, because the manager has control of how the monies are spent. I agree with that. I think, Your Honor, the only thing that I would respond to that is I don't think the charge matters so much. So, for example, if we charge a false statement to a bank under 1014, then I don't think that that somehow exonerates the defendant from a specific enhancement. But you have to advance the crime. Correct. It does focus on the crime, it seems to me. That the bank does? No, that the trust focuses on the crime. I agree, Your Honor, yes. But I think if you look at the guidelines, it does not say in there that it's specific as to the crime. It's their position and whether it facilitates it. Facilitates, so it focuses on the facilitation of the specific crime, not, in this case, there was no crime against Big Sky, right? Correct. Yes, I think that's accurate, Your Honor. And unless there are any other questions from the court about those or about the abuse of trust enhancement, I think that the court understands our position, that we're focused more so on the role of the defendant as the managing member. And if, for example. Well, did he get a role enhancement? He did. Yeah. Oh, no, no, he did not get a role enhancement in terms of his position. It was only for the abuse of trust enhancement. Okay. But I think, and to make my point. He got a note enhancement and that was for abuse of, he lied under oath. Obstruction. Obstruction of justice, that's correct. And the judge said that Mr. Moore, I'm looking at, I think the quote, testified under oath that anything above $600,000 was his money to keep. And then that testimony reported was false and it was a material misrepresentation. Does the record reflect that he said that, that I'm entitled to receive anything above $600,000? Because the brief's kind of a little ambiguous to me. You're right, Your Honor. Let me walk you through that. So we say that he says that. And then Mr. Moore responds in his reply on page 27 and says, Moore did not say that. Moore stated he purchased the leases in question for an agreed price of $10 per acre, 60,000 acres or 600,000. He then sold his interest in the leases to Big Sky Mineral Resources for $100 per acre or $6 million. So essentially took it from his left hand, put it in his right hand, and all of a sudden we have a 900% increase. So in the record on page 344, Mr. Moore says, it was my money because I sold my interest. And that was on cross-examination. So in other words, Mr. Moore says that anything above $600,000 was his to keep because that was his money. So the quote, it seemed like a quote that the judge was referring to was an interpretation of the testimony, not a direct quote. That's exactly right. But I think what the judge did is he's going right to the point. Let's get right to the heart of what Mr. Moore was testifying about. And I think that matters for the court because really the financial records prove the crime because you have the money coming in. And then now Mr. Moore has to explain why are all of these personal expenditures occurring. And so now he has to come up with this idea that this actually was my money that had increased overnight. And so therefore people were actually paying for my interest over that. And I'd be more than happy to discuss some of the representations that were made to some of the victims. But I think what happened ultimately with Mr. Moore, Judge Morris was able to see Mr. Moore testify. I mean, they were sitting essentially six or so feet apart from each other. And in there you can see that there are problems with Mr. Moore's claim right away because he wants to say that he bought it and then he sold it to Big Sky Mineral Resources. But what we cited in our brief and what I think is important is at 1954 there is the letter of intent. And that letter of intent was not between Kevin Moore and Summit West Oil. That was between Big Sky Mineral Resources and Summit West Oil. And then I think what happens is that ultimately Mr. Moore goes too far. And you can see this on SCR 1840 and 41 where Mr. Moore says everybody knows that I was selling my interest at $100 an acre and no other representations whatsoever. And if you go through each victim, Mr. Moore would make many representations to them, including that the leases were $3 million. Then it was $6 million at trial. When he was originally purchasing them, he needed $600,000 from Bill Coffey. So you can see those representations for the victims throughout. If there are no other questions from the court, I will ask the court to affirm the district court. Thank you. Thank you. I thought I'd start with the questions you had about obstruction. Obstruction generally requires testimony that's irreconcilable with the jury's verdict. It was testimony by four witnesses, five witnesses, I'm sorry, that was consistent with Mr. Moore's testimony that he was selling interest in the company. That was Gillingham, Helen, Jansen, and Schrader. And I missed one in my reply brief, but it's quoted conveniently in my initial brief, Janet Walters. Janet Walters said, we were investing money, we were going to get a reimbursement for our payment, and we were going to get an interest in the company, which is consistent with what Mr. Moore said in his testimony. And your honors, with your experience on the bench and your experience as lawyers, there are frequently in business transactions agreements that are in writing, and the parties can't agree as to their respective rights and obligations. And here, there is no writing. Two million dollars, one witness paid $800,000, and then guess what? There's a dispute as to the respective rights and obligations of the parties. And what I would characterize that dispute as, and what I would characterize Mr. Moore's testimony as, his allegedly false obstructionist pejorious testimony, as more properly explained by confusion, mistake, or faulty memory. The type of confusion, mistake, or faulty memory that occurs in many business transactions and litigation related is the same. Abuse of trust, it's the misplaced trust that's inherent in the fraud accusation. There's no special amount of trust that was abused, no private trust relationship that was abused, no particular relationship like therapist, psychiatrist. He allegedly had a certain level of skill and knowledge that the investors relied upon when they invested with him. That's correct, Your Honor. Can I answer your question? Sure. My time's a little bit over. No, please. He had a particular amount of what? Skill and knowledge? Not one that 3B1. Not one that the abuse of trust enhancement recognizes as special. His only special, he had no special training, no special education, no special licensure, no fiduciary-like relationship, nothing like that. And most of these people were investing for the simple reason that they wanted to make money. The price of oil was $100 a barrel at the time he was taking money, $30 a barrel at the time he was trying to get his Phase II financing. Thank you. Thank both of you for the argument in the briefing. I will say it was kind of nice to see a few colored photos in the briefing as we were flipping through the iPad and reading and reading and reading, not that we discredit any place where there's not colored photos. Thank you very much. We will adjourn for the morning.
judges: McKeown, Paez, Huck